IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FEDERAL AGRICULTURAL MORTGAGE CORP,

       Plaintiff,

       v

IT'S A JUNGLE OUT THERE, INC dba VINTAGE CAPITAL, et al,

       Defendants.

_____

IT'S A JUNGLE OUT THERE, INC dba VINTAGE CAPITAL, et al,

       Counterclaimants,

       v

FEDERAL AGRICULTURAL MORTGAGE CORPORATION, et al,

       Counterdefendants.

_____

IT'S A JUNGLE OUT THERE, INC dba VINTAGE CAPITAL, et al,

No C 03-3721 VRW

ORDER

Third-party plaintiffs,

v

STEWART TITLE GUARANTY CO, et al,

Third-party defendants.

_____/

This case involves the fallout from an agricultural loan transaction gone awry. Defendant It's a Jungle Out There, Inc, dba Vintage Capital ("Vintage") originated the loan in 1999 and immediately sold it to plaintiff Federal Agricultural Mortgage Corporation ("Farmer Mac"), a federally chartered corporation that makes a secondary market in agricultural loans. Zions First National Bank ("Zions") was Farmer Mac's central servicer for the loan. Stewart Title Guaranty Company ("Stewart") issued a title insurance policy for the real property securing the loan. New Century Title Company ("New Century") provided escrow services in connection with the loan transaction. After the borrower, RAM Investments, LLC, defaulted, Farmer Mac asserted its contractual rights against Vintage and ultimately filed a complaint in this court against Vintage and its principals Robert and Ami Hower (collectively, "the Howers"), who in turn asserted numerous counterclaims and third-party claims against Farmer Mac, Zions, Stewart and New Century (as well as other individuals and entities no longer parties to this action).

Vintage and the Howers separately move to dismiss the amended complaint filed by Farmer Mac. Doc ##113, 114. Farmer Mac

moves for summary adjudication on the issue of breach in connection with its claim for breach of contract against Vintage.  Doc #135. Farmer Mac and Zions jointly move for summary judgment against Vintage and the Howers on all counterclaims.  Stewart, New Century and Zions separately move for summary judgment against Vintage and the Howers on all third-party claims.  Doc ##119, 123, 133.

For reasons discussed below, the motions to dismiss the amended complaint are DENIED.  Summary judgment in favor of Vintage and the Howers on Farmer Mac's Lanham Act claims is GRANTED IN PART and DENIED IN PART.  Farmer Mac's motion for summary adjudication on its claim for breach of contract is GRANTED IN PART and DENIED IN PART.  Farmer Mac and Zions' motion for summary judgment in their favor on all counterclaims is GRANTED.  Stewart and New Century's respective motions for summary judgment in their favor on all third-party claims are GRANTED; consequently, Stewart's motion to bifurcate the third-party claims is DENIED AS MOOT.  Zions' motion for summary judgment in its favor on all third-party claims is GRANTED IN PART and DENIED IN PART.

I

A

Farmer Mac is a federally chartered corporation regulated by the Farm Credit Administration.  Farmer Mac makes a secondary market for agricultural mortgages by purchasing "qualified" loans from "approved" loan sellers.  In order to become an approved seller, loan originators must enter into a master seller/servicer agreement with Farmer Mac ("S/S agreement"), which incorporates by reference an accompanying seller/servicer guide ("S/S guide").

Farmer Mac and Vintage entered into an S/S agreement in 1998, which defendant Robert Hower signed in his capacity as chairman of Vintage.

In order to ensure that loans meet Farmer Mac standards, approved sellers must submit a loan application package consisting of several components.  First, sellers must prepare a loan "narrative."  The S/S guide provides that "the loan narrative should present the total potential exposure to Farmer Mac" and specifies information about the proposed borrowers that must be included in the narrative.  Doc #131 (Appendix), Ex 3, Chapter 202 at Ex A.  Second, sellers must provide Farmer Mac with credit reports for all borrowers and guarantors.  The credit report for each borrower and guarantor must disclose "all available public records information," including "any judgments, foreclosures, tax liens, or bankruptcies [that] were discovered in the public records."  Id § 202.1.  Further, the seller is "expected" to verify all information contained in the credit reports and "should" explain in writing any undisclosed debts because "omission of this information is often considered grounds for denying the loan."  Id.

Third, sellers must obtain an independent appraisal of the property.  The appraisal is to assess the value of the collateral according to guidelines prescribed by Farmer Mac.  Sellers must verify the appraisal by completing an "administrative appraisal review report" ("AARR").  The purpose of the AARR is to verify "that the understandings conveyed through the [appraisal] as well as certain factual data set forth in the [appraisal] accurately reflect the conditions of the property being appraised."  Id § 204.5.  An environmental survey report must also be submitted.

4

The purpose of this report is to identify any liabilities "that may be associated with any hazardous waste or other environmental concerns." Id § 203.7(10). The appraiser is required to verify the environmental survey report.

The S/S guide obligates sellers to make extensive representations and warranties in connection with each loan offered for sale to Farmer Mac. First and foremost, sellers must represent that "loan information submitted to Farmer Mac is true and correct." Id § 304.3(1). (Other representations and warranties will be referenced as needed below.) Sellers who make untrue representations or warranties "will be required either to cure, replace (with a Qualified Loan satisfactory to Farmer Mac) or repurchase a Qualified Loan sold or transferred to Farmer mac if any breach of a representation or warranty is discovered." Id § 305.2.

Farmer Mac may terminate the S/S agreement "for cause based upon the existence of" an event of default. Id § 503.2. The S/S guide specifies several events of default, including failure "to comply with any one or requirement, term, or condition of" the S/S agreement or guide, the making of "false or misleading representations or warranties" and failure to service loans in accordance with the requirements of the S/S agreement or guide. Id § 503.1(3). Termination of the S/S agreement terminates a seller's status as an approved seller. Id.


                              B

In 1999, the Singh/Sidhu family approached Vintage for the purpose of refinancing two apple orchards (separately, the

                              5

"Chelan orchard" and the "Mattawa orchard").  Jarnail Singh was the title holder of record for both properties.  Because Mr Singh was not a resident alien of the United States, he was ineligible to borrow from Farmer Mac.  In order to overcome this hurdle, the Singh/Sidhu family formed RAM Investments, LLC ("RAM").  Mr Singh's son Kulwinder (Calvin) Sidhu, a permanent legal resident of the United States, was named managing member and was given a 51% interest in RAM.  RAM thus qualified as a Farmer Mac borrower because a majority of its interest was owned by a permanent legal resident of the United States.  Mr Singh and his other son Devinder Sidhu were also members of RAM.  Mr Singh transferred the orchard properties to RAM, thereby paving the way for a Farmer Mac loan. In June 1999, Vintage submitted an application to Farmer Mac requesting a loan on behalf of RAM.  The apple orchards were offered as security for the loan.

As required by the S/S guide, Vintage presented to Farmer Mac a loan "narrative" describing and assessing RAM and the Singh/Sidhu family (the "RAM narrative").  Appendix, Ex 7.  In the RAM narrative, Vintage stated that Mr Singh had "an exemplary credit history."  Id at 8.  With respect to the collateral, Vintage stated that "[t]he value is not dependent upon perfection of any lien instrument in addition to the mortgage(s) * * *."  Id at 13. Robert and Ami Hower both signed the RAM narrative.  Vintage also obtained an independent appraisal of the orchards, which was verified in an AARR signed by Robert Hower.  Id, Exs 9, 14.

In anticipation of closing, Vintage engaged Stewart to provide title services and New Century to provide escrow services. As the closing date approached, Vintage and New Century

6

communicated with Zions, Farmer Mac's central servicer, regarding various arrangements and details attending the transaction.  On September 23, 1999, Vintage loaned RAM $1,932,000 and assigned the note and mortgage to Farmer Mac.  Farmer Mac issued a commitment to purchase the RAM loan on September 30, 1999, and escrow closed on October 8, 1999.

In January 2001, RAM defaulted on the loan.  Farmer Mac foreclosed on the two orchards in April 2002.  In the course of attempting to liquidate the loan security, Farmer Mac discovered several facts surrounding the orchards and Jarnail Singh that, according to Farmer Mac, should have been disclosed or otherwise addressed by Vintage prior to the close of escrow.  Invoking its remedies for breaches of the S/S agreement and guide, Farmer Mac demanded that Vintage repurchase the RAM loan.  Vintage's failure to do so prompted Farmer Mac to "suspend" Vintage as an loan originator and seller for Farmer Mac December 10, 2002.  Farmer Mac formally terminated Vintage as an approved seller on March 23, 2003, and as a field servicer on August 18, 2003.

Farmer Mac filed its original complaint against Vintage and the Howers on August 11, 2003.  Doc #1.  The original complaint asserted claims for breach of contract, fraud, negligent misrepresentation, false advertising and trademark infringement.  Doc #1.  Vintage and the Howers responded to the original complaint with counterclaims against Farmer Mac for breach of contract and breach of the implied covenant of good faith and fair dealing.  Against both Farmer Mac and Zions, Vintage and the Howers allege trade libel, restraint of trade and intentional interference with prospective economic advantage.  Doc #6.  (The court notes that

7

Zions was not an original party to the action, and thus was not an "opposing party" for purposes of FRCP 13(a) or (b). This potential procedural defect has not been raised by any party thus far in the litigation. Given the ultimate disposition of the claims asserted against Zions in the second amended counterclaim, the court will simply treat Zions as a properly joined counterdefendant pursuant to FRCP 13(h).) Vintage and the Howers also filed a third-party complaint, alleging various claims for indemnity and contribution against Stewart, New Century and Zions. Doc #15.

Almost two years later, Farmer Mac amended its complaint to add a claim for express indemnity. Doc #110 (FAC). Vintage and the Howers responded with separate motions to dismiss the amended complaint pursuant to FRCP 12(b)(6). The court will address these motions first.

II

Rule 12(b)(6) motions to dismiss essentially "test whether a cognizable claim has been pleaded in the complaint." Scheid v Fanny Farmer Candy Shops, Inc, 859 F2d 434, 436 (6th Cir 1988). Although a plaintiff is not held to a "heightened pleading standard," the plaintiff must provide more than mere "conclusory allegations." Swierkiewicz v Sorema NA, 534 US 506, 515 (2002) (rejecting heightened pleading standards); Schmier v United States Court of Appeals for the Ninth Circuit, 279 F3d 817, 820 (9th Cir 2002) (rejecting conclusory allegations).

Under Rule 12(b)(6), a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim

which would entitle him to relief." <u>Hughes v Rowe</u>, 449 US 5, 9 (1980) (citing <u>Haines v Kerner</u>, 404 US 519, 520 (1972)); see also <u>Parks School of Business, Inc v Symington</u>, 51 F3d 1480, 1484 (9th Cir 1985). All material allegations in the complaint must be taken as true and construed in the light most favorable to plaintiff. See <u>Gompper v VISX, Inc</u>, 298 F3d 893, 895 (9th Cir 2002). But "the court [is not] required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." <u>Sprewell v Golden State Warriors</u>, 266 F3d 979, 988 (9th Cir 2001) (citing <u>Clegg v Cult Awareness Network</u>, 18 F3d 752, 754-55 (9th Cir 1994)).

**A**

The court first addresses the timeliness of the motions to dismiss the claims asserted against Vintage and the Howers in the original complaint (i e, all claims except for the claim for express indemnity). Vintage and the Howers filed an answer to the original complaint without filing a Rule 12(b) motion. Vintage and the Howers' answer stated -- without elaboration and in boilerplate fashion -- that the "complaint fail[ed] to state a claim upon which relief could be granted." Doc #6 at 7. Vintage and the Howers did not otherwise challenge the original complaint under Rule 12(b)(6). More than two years after the filing of the original complaint and extensive discovery, Farmer Mac sought and obtained (without opposition) leave to amend its complaint to add a claim for express indemnity. The amended complaint did not modify the claims asserted in the original complaint. In lieu of a responsive pleading, Vintage and the Howers filed the present motions to

**9**

dismiss all claims pursuant to Rule 12(b)(6).

Generally, a motion to dismiss for failure to state a claim must be made before any responsive pleading; otherwise, the motion is untimely. <u>Aetna Life Ins Co v Alla Medical Servs, Inc</u>, 855 F2d 1470, 1474 (9th Cir 1988). Vintage and the Howers posit that the amended complaint revived their ability to attack all claims, including the original claims reasserted without modification, pursuant to Rule 12(b)(6) -- explaining, perhaps, Vintage and the Howers' uncharacteristic decision not to oppose Farmer Mac's motion for leave to amend.

According to one leading commentator, "[t]he filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to the amendment of the pleading; conversely, a Rule 12 defense that becomes available because of new matter in the amended complaint may be asserted by motion." Wright & Miller, 5D <u>Federal Practice & Procedure</u> § 1388, at 491-92 (3d ed 2004). Although the Ninth Circuit has not had occasion to apply this principle, the weight of authority outside this circuit holds that where the complaint is amended after the defendant has filed a Rule 12(b) motion, the defendant may not thereafter file a second Rule 12(b) motion asserting objections or defenses that could have been asserted in the first motion. See <u>Sears Petroleum & Transport Corp v Ice Ban America, Inc</u>, 217 FRD 305, 307 (NDNY 2003) ("While it is true that an amended complaint ordinarily supersedes a prior complaint, and renders it of no legal effect[,] [i]t is also true that if the amended complaint also contains new matter, the defendant may bring a second motion under Rule 12 to object to the

new allegations only." (citations omitted)); <u>Wafra Leasing Corp</u> <u>1999-A-1 v Prime Capital Corp</u>, 247 F Supp 2d 987, 999 (ND Ill 2002); <u>Rowley v McMillan</u>, 502 F2d 1326, 1333 (4th Cir 1974) ("An unasserted defense available at the time of response to an initial pleading may not be asserted when the initial pleading is amended."); <u>Keefe v Derounian</u>, 6 FRD 11, 13 (ND Ill 1946).

This case differs from the above-cited cases in one respect:  Vintage and the Howers' initial response to the original complaint was in the form of an answer rather than a Rule 12(b) motion.  The court perceives the difference to be immaterial.  The parties, however, have not placed timeliness squarely in issue; nor does the court find it appropriate in this case to treat Vintage and the Howers' motions as motions for judgment on the pleadings pursuant to FRCP 12(c).  Accordingly, the court declines to find Vintage and the Howers' motions untimely insofar as they challenge claims asserted in the original complaint.  But the timing of the motions is nonetheless relevant to Vintage and the Howers' argument for dismissing the fraud claim, to which the court now turns.

**B**

*Fraud*

Although the substantive elements of Farmer Mac's fraud claim are governed by state law, those elements must be pleaded in accordance with FRCP 9(b).  <u>Vess v Ciba-Geigy Corp USA</u>, 317 F3d 1097, 1103 (9th Cir 2003).  Rule 9(b) requires that "circumstances constituting fraud" be stated with particularity.  To satisfy this heightened pleading standard, a plaintiff must set forth "the who, what, when, where, and how" of the alleged misconduct.  Id at 1106

(internal quotations omitted).  In other words, a "plaintiff must include statements regarding the time, place, and nature of the alleged fraudulent activities * * *."  In re Glenfed, Inc Securities Litig, 42 F3d 1541, 1548 (9th Cir 1994).  Further, "plaintiff must set forth what is false or misleading about a statement, and why it is false."  Id.  Vintage argues that Farmer Mac "has failed to identify who made any of the alleged misrepresentations or the source of the alleged representations or when and where the alleged misrepresentations were made."  Doc #114 at 5.  Similarly, the Howers argue that Farmer Mac has failed "to identify any alleged representations by the Howers or the source of the Howers alleged representations [sic] or when and where the Howers made such alleged representations."  Doc #113 at 9.

The amended complaint alleges that "Defendants" made several specific representations in connection with the RAM loan, as required by the S/S agreement and guide.  FAC ¶11.  The complaint further alleges that "Defendants" made additional representations in the RAM narrative regarding the quality of the RAM loan in general and Jarnail Singh's exemplary credit history in particular.  Id ¶12.  The complaint goes on to explain what was false about each of the representations.  Id ¶19.  The court is satisfied that these allegations describe with sufficient particularity the alleged representations and the reasons why those representations were false.

Arguably, the complaint fails to attribute representations to either Robert or Ami Hower with adequate specificity.  The complaint states that "[a]t all times herein referenced, each of the above-referenced misrepresentations were

made by Robert Hower and Ami Cheri Hower in their capacities as officers of [Vintage]." Id ¶21. If, as it appears, Farmer Mac intended to allege that both Robert and Ami Hower made each of the alleged representations, then in order to comply with Rule 9(b), Farmer Mac should have specifically so alleged rather than using the blanket term "Defendants". Without citation to legal authority, Farmer Mac insists that "[m]ore is not necessary" where the fraud allegations "are directed at both of the [d]efendants who jointly and in concert committed the fraud alleged." Doc #155 at 20. Indeed, courts in the past have stated that "once [the complaint] has adequately identified a particular defendant with a category of defendants allegedly responsible for some continuing course of conduct," Rule 9(b) does not require that the complaint "plead more than the group conduct of the defendants." In re Equity Funding Corp of America Securities Litig, 416 F Supp 161, 181 (CD Cal 1976).

The court need not at this time determine the continuing viability of this gloss on Rule 9(b) because even if the court were to conclude that the fraud allegations do not attribute the alleged misrepresentations to the individual defendants with sufficient particularity, "to grant defendant[s'] motion[s] in this case would be to reward defendant[s] for not bringing [their] Rule 9(b) motion in a more timely manner." Independent Energy Corp v Trigen Energy Corp, 944 F Supp 1184, 1199 (SDNY 1996). Ordinarily, the court would grant leave to amend a claim that is dismissed for failure to satisfy Rule 9(b). In this case, however, Farmer Mac might be denied an opportunity to amend its claim due to the fast-approaching trial date. Additionally, Vintage and the Howers are

13

"not confronted with the type of conclusory or speculative allegations against which Rule 9(b) seeks to guard." Id. Finally, a core purpose of Rule 9(b) is "to give defendants adequate notice to allow them to defend against the charge." <u>In re Stac Electronics Securities Litig</u>, 89 F3d 1399, 1404 (9th Cir 1996). Here, there can be no serious question that Vintage and the Howers have filed a pleading responsive to the fraud claim and have had ample opportunity through discovery to ascertain the full factual basis of Farmer Mac's fraud claim. Under these circumstances, dismissal will not further the purposes of Rule 9(b).

## C

### *Negligent Misrepresentation*

As with Farmer Mac's fraud claim, Vintage and the Howers argue that Farmer Mac's failure to plead with sufficient particularity is a basis for dismissing the claim for negligent misrepresentation. Vintage and the Howers fail to appreciate, however, that these two birds it hopes to kill with one stone are, for pleading purposes, of a different feather. "'Although [Rule] 9(b) does not expressly apply to a claim for negligent misrepresentation, [Rule] 8 does require plaintiffs to give defendants fair notice of the claim against them.'" <u>In re Heritage Bond Litig</u>, 289 F Supp 2d 1132, 1154 (CD Cal 2003) (quoting <u>Foster v Allstate Insurance Co</u>, 1995 WL 396646, at *2 (SD Cal 1995)) (brackets omitted). "The complaint should state, among other things, the facts alleged to have been misrepresented by the defendants and the identity of the person who made the statements." Id. The court has already found that the complaint adequately

14

specifies the facts alleged to have been misrepresented. And in light of (1) the court's refusal to dismiss the fraud claims for failure to attribute each alleged misrepresentation to the individual defendants and (2) the less rigorous pleading standard applicable to claims for negligent misrepresentation, the court will not dismiss the claims for negligent misrepresentation for want of specificity with regard to the identity of the defendants who made the statements.

## D

### *Breach of Contract*

Vintage first argues that the S/S guide is "noncontractual" and therefore cannot serve as the predicate for breach of contract. Doc #114 at 6. The court disagrees. The complaint alleges that Robert Hower, acting in his official capacity on behalf of Vintage, entered into the S/S agreement with Farmer Mac on January 2, 1998. FAC ¶8. Farmer Mac further alleges that the S/S agreement incorporates the S/S guide by reference. Id, ¶11. Taking these allegations together, Farmer Mac has sufficiently alleged that Vintage was contractually bound by the terms of the S/S guide.

Next, Vintage argues that Farmer Mac failed to allege "that the provisions at issue were in effect when [Vintage] entered into the agreement or when [Vintage] offered to sell Farmer Mac the RAM loan." Doc #114 at 5. The thrust of this argument is that because the S/S guide is subject to modification, it is possible that the terms Vintage allegedly breached took effect after Vintage sold the RAM loan to Farmer Mac. See id at 6. Yet despite

extensive discovery up to this point, Vintage presents no evidence that the S/S guide was in fact modified subsequent to January 2, 1998. And interestingly, Vintage and the Howers have based their own counterclaims on the terms of the guide that they now suggest to be "noncontractual". See Doc #57, ¶7.

In any event, Farmer Mac has alleged that (1) Vintage and Farmer Mac entered into the agreement on January 2, 1998, (2) Vintage has "since" sold loans to Farmer Mac pursuant to the agreement and (3) Vintage did not originate the RAM loan until September 23, 1999. FAC ¶¶8-9. In other words, the complaint states that the acts constituting the alleged breach occurred subsequent to formation of the contract. Vintage has offered no authority indicating Farmer Mac must specifically allege that the relevant terms of the agreement and guide were "in effect" at the relevant time.

Because the breach of contract claim is asserted against Vintage only, Doc #155 at 9, the court need not consider the Howers' separate arguments for 12(b)(6) dismissal.

E

*Express Indemnity*

"An indemnitee seeking to recover on an agreement for indemnification must allege the parties' contractual relationship, the indemnitee's performance of that portion of the contract which gives rise to the indemnification claim, the facts showing a loss within the meaning of the parties' indemnification agreement, and the amount of damages sustained." Four Star Electric, Inc v F & H Construction, 7 Cal App 4th 1375, 1380 (1992). Vintage does not

16

dispute that Farmer Mac's complaint alleges each of these elements. Rather, the sole basis for Vintage's motion to dismiss the claim for express indemnity is that the claims alleged by Farmer Mac are not in fact encompassed by the S/S guide's indemnity provision, which states:

> The Seller shall indemnify Farmer Mac and its directors, officers and other employees and hold each of them harmless against any and all losses, claims, damages, judgments, penalties, fines and legal costs and expenses, including reasonable attorneys' fees, that they may sustain as a result of or arising out of any event of default, including but not limited to those that are in any reasonable way related to the actual or alleged failure of the Seller to perform its duties and service the Qualified Loans in strict compliance with the terms of [the S/S agreement and guide]. The obligations of the Seller under this Subsection shall survive delivery and payment for the Qualified Loans and termination of the Seller's relationship with Farmer Mac. <u>The Seller shall immediately notify Farmer Mac if a claim is made by a third party with respect to [the S/S agreement, the S/S guide] or any Qualified Loan, and may assume, with Farmer Mac's prior written consent, the defense of any such claim at the Seller's expense</u>.

Appendix, Ex 3, § 503.3 (emphasis added).

Farmer Mac did not recite the underscored language in its amended complaint. Vintage maintains that this language "establishes that the provision applies [only] to claims made by third parties with regard to Farmer Mac's conduct or loans." Doc #114 at 9. "Without the third sentence," Vintage argues, "the provision is incomplete and nonsensical." Id. Vintage's argument fails to persuade.

The first sentence of the indemnity provision clearly states that sellers are required to indemnify and hold Farmer Mac harmless against "<u>any and all</u>" claims arising out of "<u>any</u>" event of default. The S/S agreement further evidences the broad scope of

17

sellers' obligations to indemnify Farmer Mac: "Seller will be in default under the [S/S agreement] upon the occurrence of <u>any</u> Event of Default under the [S/S guide], and will be subject to any remedies available to Farmer Mac, including, but not limited to, indemnification of Farmer Mac * * *." Appendix, Ex 2, § 5 (emphasis added). In other words, Farmer Mac may seek indemnification for losses arising from "<u>any</u>" event of default, not just events of default giving rise to claims by third parties.

The third sentence does not narrow the scope of sellers' obligation to indemnify Farmer Mac. Rather, the third sentence of the S/S guide's indemnity provision simply addresses a subset of sellers' obligations, viz, in the event a third party files a claim implicating the S/S agreement, the S/S guide or a Farmer Mac loan, sellers must notify and, with Farmer Mac's consent, defend Farmer Mac. This in no way limits sellers' obligations to indemnify Farmer Mac for "<u>any and all</u>" claims arising from "<u>any</u>" event of default. There can be no doubt that the claims asserted by Farmer Mac in this case (with the exception of the Lanham Act claims, see *infra* III) fit this description.

Because the claim for express indemnity is asserted against Vintage only, Doc #155 at 9, the court need not consider the Howers' separate arguments for 12(b)(6) dismissal.

E

Vintage's motion to dismiss is DENIED. The Howers' motion to dismiss is likewise DENIED.

//

//

"Farmer Mac" is registered as a service mark with the United States Patent and Trademark Office. Following Farmer Mac's suspension of Vintage as an approved seller, Farmer Mac requested that Vintage correct statements on Vintage's website that represented Vintage to be a Farmer Mac lender. Doc #201 (Oslick Decl), Ex A. Farmer Mac repeated this request on January 29, 2003. Id, Ex B. As of August 5, 2003, Vintage's website continued to state that Vintage offered "Long Term, Fixed Rate Agricultural Loans through Farmer Mac" and that Vintage was "an approved Farmer Mac Lender whose focus is tailored to serve the needs of the wine industry." Id, Ex C. One page on Vintage's website was dedicated to describing the benefits of Farmer Mac loans, with the phrase "A Farmer Mac Lender" prominently displayed at the top of the page right below Vintage's name. Id. The appears to be no dispute that Vintage has removed all references to Farmer Mac from its website.

Farmer Mac's fourth claim seeks injunctive relief for false advertising under § 43(a) of the Lanham Act, 15 USC § 1125(a), which creates liability against any person who "uses in commerce any word, term, name, symbol, or device, or any combination thereof, of * * * false or misleading representation of fact which * * * is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, or commercial activities by another person * * *." Id § 1125(a)(1). Farmer Mac's fifth claim seeks monetary and injunctive relief for trademark infringement under § 32 of the Lanham Act, 15 USC § 1114, which creates

liability against any person who without consent "use[s] in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such is likely to cause confusion, or to cause mistake, or to deceive * * *."  15 USC § 1114.

When the matter came before the court, the court notified Farmer Mac that it intended to treat Vintage and the Howers' motions to dismiss the Lanham Act claims as motions for summary judgment and allowed Farmer Mac an opportunity to present evidence supporting its Lanham Act claims.  See Portsmouth Square, Inc v Shareholders Protective Committee, 770 F2d 866, 869-70 (9th Cir 1985) (holding it proper for district court *sua sponte* to grant summary judgment at a pretrial conference where discovery was complete and losing party "was adequately notified that it might have to defend the sufficiency of its claim").


                                    A

In reviewing a motion for summary judgment, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v Liberty Lobby, 477 US 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id.  And the burden of establishing the absence of a

genuine issue of material fact lies with the moving party.  Celotex
Corp v Catrett, 477 US 317, 322-23 (1986).  Summary judgment is
granted only if the moving party is entitled to judgment as a
matter of law.  FRCP 56(c).

The nonmoving party may not simply rely on the pleadings,
however, but must produce significant probative evidence, by
affidavit or as otherwise provided in FRCP 56, supporting its claim
that a genuine issue of material fact exists.  TW Elec Serv v
Pacific Elec Contractors Ass'n, 809 F2d 626, 630 (9th Cir 1987).
The evidence presented by the nonmoving party "is to be believed,
and all justifiable inferences are to be drawn in his favor."
Anderson, 477 US at 255.  "[T]he judge's function is not himself to
weigh the evidence and determine the truth of the matter but to
determine whether there is a genuine issue for trial."  Id at 249.

The evidence presented by both parties must be
admissible.  FRCP 56(e).  Conclusory, speculative testimony in
affidavits and moving papers is insufficient to raise genuine
issues of fact and defeat summary judgment.  Thornhill Publishing
Co, Inc v GTE Corp, 594 F2d 730, 738 (9th Cir 1979).  Hearsay
statements in affidavits are inadmissible.  Japan Telecom, Inc v
Japan Telecom America Inc, 287 F3d 866, 875 n1 (9th Cir 2004).

B

Vintage and the Howers argue that the claim for
injunctive relief is moot because Vintage has removed all Farmer
Mac references from its website.  Farmer Mac argues that
discontinuance of infringement or false advertising does not
necessarily moot claims for injunctive relief under the Lanham Act.

21

Farmer Mac relies upon Levi Strauss & Co v Shilon, 121 F3d 1309 (9th Cir 1997), and Polo Fashions, Inc v Dick Bruhn, Inc, 793 F2d 1132 (9th Cir 1986).

Polo Fashions involved claims for trademark infringement. After finding liability, "the district court refused to grant an injunction because the plaintiffs had not introduced any specific evidence to demonstrate that the defendants would infringe in the future." Id at 1135. A panel of the Ninth Circuit unanimously reversed:

> The defendants had willfully violated Polo's trademark rights. The defendants refused to stop violating those rights until Polo brought suit in federal district court. We should not require Polo also to introduce concrete evidence that the defendants are likely to infringe again. If the defendants sincerely intend not to infringe, the injunction harms them little; if they do, it gives Polo substantial protection of its trademark.

Id at 1135-36.

Levi Strauss involved claims under the Lanham Act for marketing counterfeit goods and unfair competition. The district court enjoined defendant from continuing to deal in infringing products. On appeal, defendant argued that the injunction was unnecessary because defendant had ceased violating plaintiff's rights under the Lanham Act. The Ninth Circuit wasted no time rejecting this argument:

> A trademark plaintiff is entitled to effective relief; and in any doubt in respect of the extent thereof must be resolved in the plaintiff's favor as the innocent producer and against the defendant, which has shown by its conduct that it is not to be trusted. [Plaintiff] is not required to produce evidence that [defendant] is likely to infringe again.

Levi Strauss, 121 F3d at 1314 (citations and quotations omitted).

22

Vintage and the Howers' mootness argument must fail under Polo Fashions and Levi Strauss. The court declines to address the merits of Farmer Mac's claims for injunctive relief at this time. Summary judgment in favor of Vintage and the Howers on Farmer Mac's claims for injunctive relief under the Lanham Act is DENIED.

C

"Section 35 of the Lanham Act, 15 USC § 1117(a), governs the award of monetary remedies in trademark infringement cases and provides for an award of defendant's profits, any damages sustained by the plaintiff, and the costs of the action." Lindy Pen Co, Inc v Bic Pen Corp, 982 F2d 1400, 1405 (9th Cir 1993). To recover damages, "plaintiff must prove both the fact and amount of damage." Id at 1407; see also Intel Corp v Terabyte Int'l, Inc, 6 F3d 614, 620 (9th Cir 1993).

Farmer Mac has not presented any evidence of damages or profits, much less damages or profits reasonably attributable to the alleged infringement. Farmer Mac appears to take the position that it need not prove the existence of damages to obtain an accounting of Vintage's profits. This argument misses the mark; in order to obtain disgorgement, Farmer Mac must prove that Vintage and the Howers profited during the relevant time period, and summary judgment is appropriate in the absence of such evidence. See Committee for Idaho's High Desert, Inc v Yost, 92 F3d 814, 823 (9th Cir 1996) (affirming summary judgment on claims for monetary relief under 15 USC § 1117(a) where plaintiff offered no evidence that defendant profited).

//

Claims for monetary relief under the Lanham Act may be properly disposed of on summary judgment, see id at 823, even if a claim for injunctive relief is allowed to stand, see Strike It Rich, Inc v Jos Schlitz Brewing Co, 505 F Supp 89, 91 (DDC 1980). The court finds such a disposition to be appropriate in this case and accordingly GRANTS partial summary judgment in favor of Vintage and the Howers on Farmer Mac's claims for damages and disgorgement under the Lanham Act.

IV

Before turning to the Farmer Mac's motion for summary adjudication and Farmer Mac and Zions' motion for summary judgment, the court addresses Vintage and the Howers' objections to evidence submitted by Farmer Mac and Zions in support of their respective motions, Doc #168, and Farmer Mac's request for judicial notice, Doc #209.

Defects in the authenticity of deposition transcripts and records of judicial proceedings have been cured through supplementary declarations. See Doc #179, Exs 81-83. Moreover, the following documents were authenticated by Robert Hower through his (now-authenticated) deposition testimony, Appendix, Ex 65 (Hower Depo): (1) the S/S agreement, Appendix, Ex 2 (see Hower Depo at 51:23-52:20); (2) the RAM Narrative, Appendix, Ex 7 (see Hower Depo at 270:1-23); (3) the appraisal, Appendix, Ex 9 (see Hower Depo at 140:25-141:9); (4) the AARR, Appendix, Ex 14 (see Hower Depo at 175:1-25); (5) the revised preliminary loan approval notice, Appendix, Ex 13 (see Hower Depo at 123:13-124:11); and (6) an agricultural financial statement for Jarnail Singh dated

United States District Court

For the Northern District of California

September 27, 1999, Appendix, Ex 50 (see Hower Depo 400:9-22).  The
e-mails contained in Exhibit 56 were authenticated by the
declaration of Gary Johnson, Doc #137, and the court finds the
copies of records relating to water rights to be authentic pursuant
to FRE 901(b)(4), see <u>Orr v Bank of America</u>, 285 F3d 764, 778 n24
(9th Cir 2002).  Objections to the authenticity of the foregoing
exhibits are OVERRULED.

The court SUSTAINS objections to hearsay evidence
contained in Exhibits 21 and 27.  Several of the exhibits to which
defendants/counterclaimants object are not offered for the truth of
the matter asserted; objections to such exhibits are accordingly
OVERRULED.

The remaining objections to authenticity and hearsay are
OVERRULED as the court has not relied upon the challenged evidence.

Farmer Mac's request for judicial notice of records
relating to the ownership status of mobile homes is GRANTED.

V

Farmer Mac moves for summary adjudication on the issue of
breach in connection with its claim for breach of contract.
Summary judgment "may be rendered on the issue of liability alone
although there is a genuine issue as to the amount of damages."
FRCP 56(c); see also FRCP 56(a) (stating that parties may seek
summary judgment "upon all or any part" of a claim).  Because
Farmer Mac bears the burden of proof at trial on its claim for
breach of contract, Farmer Mac must establish that no rational
trier of fact could find in favor of Vintage on the issue of
breach.  See <u>Southern California Gas Co v City of Santa Ana</u>, 336

F3d 885, 888 (9th Cir 2003).

> Farmer Mac contends that Vintage breached its obligations
>
> (a) by failing to disclose the existence of a known tax liability with respect to Jarnail Singh, one of the borrowers/guarantors; (b) by failing to obtain security interests on mobile homes valued as part of the collateral for the loan;(c) by failing to obtain good title in mobile homes, and thereby a valid security interest on mobile homes valued as part of the collateral; (d) by including in the appraisal, valuation of mobile homes for which no good title was obtained; (e) by failing to ascertain, and misrepresenting, the nature and extent of the water rights existing on the property; and (f) by failing to disclose an existing judgment, as well as a pending lawsuit which later resulted in judgment.

Doc #136 at 1.

The court addresses each of these theories in turn.

A

*The Tax Liability and Tax Lien*

Several weeks before escrow closed on the loan, Stewart prepared a "date down" endorsement showing that the IRS had recorded a "Notice of Federal Tax Lien" in the amount of $143,405 against Jarnail Singh on August 16, 1999. Doc #187, Ex B at Ex 13. Because the tax lien had the potential to derail the RAM loan, Anne Dennis, an employee of Vintage, obtained a letter from the IRS stating that the tax liability belonged solely to Jarnail Singh as an individual and did not affect property owned by RAM. Id, Ex B at Ex 12. Apparently, this letter satisfied Stewart that the tax lien did not affect the security for the RAM loan, which consisted of property owned by RAM. Ultimately, the tax lien was not listed as an exclusion from coverage under the title insurance policy issued by Stewart. Robert Hower has admitted that Vintage was

aware of the tax lien and underlying tax liability prior to the close of escrow. Hower Depo at 422:12-25. And there is no dispute that neither the tax lien nor the underlying tax liability were disclosed to Farmer Mac in writing prior to the close of escrow. The parties dispute whether Farmer Mac or Zions were aware of the tax lien prior to final approval of the RAM loan.

Jarnail Singh was, at the very least, a "guarantor" of the RAM loan. See Appendix, Ex 13; Doc #171, Ex A at Ex 3; Doc #175 at 12. Accurate financial statements for Mr Singh were required to be submitted to Farmer Mac, notwithstanding that he was a "guarantor" rather than a "borrower" or "co-borrower." See Appendix, Ex 3, § 202.1 ("A complete and current credit report is to be obtained on all applicants and guarantors."); see also id, Glossary (defining "Borrower" as the "obligor or co-obligor on a Qualified Loan"); Id § 202.2(6) (including "co-makers and guarantors" within the meaning of "Borrowers"). Thus, Vintage was required to verify financial information for Jarnail Singh and to explain "in writing" debts or liens not disclosed in the financial statement. Id § 202.1.

Vintage argues that the IRS did not file the notice of the federal tax lien until August 16, 1999, more than two months after the loan application package was initially submitted. Doc #167 at 19. True as that may be, the fact remains Vintage submitted a financial statement for Jarnail Singh dated September 27, 1999, that did not disclose the tax liability. Appendix, Ex 50. The tax liability was required to be disclosed in this financial statement, and if it was not, Vintage was required to explain the omission in writing given its awareness of the

27

situation.  Failure to do so constituted a breach of the S/S guide.

Vintage argues that there is a triable issue of fact regarding whether the existence of the tax lien was communicated to Mr Avey of Zions prior to the close of escrow.  Although Zions' knowledge of the tax lien may go to other issues to be resolved at trial (e g, breach of duty by Zions, see *infra* VII(B)(3)), it is irrelevant for present purposes because there is no evidence that Vintage provided a written explanation of the tax lien or the underlying tax liability as required by the S/S guide.  See also Appendix, Ex 3, § 103.1 ("All notices and communications between Farmer Mac and the Seller (unless otherwise indicated by Farmer Mac), shall be in writing and shall be personally delivered, faxed, or mailed * * *.").  Vintage has presented no evidence that unwritten communications to Zions regarding the tax lien were an adequate substitute for a written explanation of the omission of the underlying tax liability from Jarnail Singh's financial statement.

Accordingly, the court finds that Vintage breached its representation and warranty that Jarnail Singh's financial statement was true and correct.  Further, Vintage breached its obligation to explain the omission of the tax liability from Jarnail Singh's financial statement to Farmer Mac in writing prior to the close of escrow.  Farmer Mac's motion for summary adjudication of this issue is GRANTED.

//

//

//

//

C

*Lawsuits and Judgment Against Jarnail Singh*

The loan application package did not disclose two civil lawsuits against Jarnail Singh dba Ram Farms.  One lawsuit resulted in a judgment against Jarnail Singh in the amount of $635.38 plus pre-judgment interest and attorney fees in the amount of $1,266.23.  This judgment was fully satisfied on April 20, 1998 (the "satisfied judgment").  Doc #179, Ex 82.  The other lawsuit was actively pending throughout the RAM transaction (the "pending lawsuit"); judgment against Jarnail Singh in the amount of $167,325.38 plus post-judgment interest was not entered until June 13, 2000 (i e, after close of escrow on the RAM loan).  Id, Ex 81.  Farmer Mac claims Vintage breached its obligations by failing to disclose these items.

1

The court first briefly addresses Vintage's suggestion that this aspect of Farmer Mac's breach of contract claim is beyond the scope of the amended complaint.  Doc #167 at 14.  As the Ninth Circuit has stated:

> Under the liberal system of notice pleading set up by the Federal Rules, Rule 8(a)(2) does not require a claimant to set out in detail the facts upon which he bases his claim.  To the contrary, all the Rules require is a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

Lee v City of Los Angeles, 250 F3d 668, 679 (9th Cir 2001) (alterations and quotations omitted); cf FRCP 54(c) ("[E]very final judgment shall grant the relief to which the party in whose favor

it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings.").

The amended complaint states "what the plaintiff's claim is" (breach of contract) and "the grounds upon which it rests" ("numerous representations and warranties made by Defendants were untrue," FAC ¶30). Although the amended complaint states several factual bases for Farmer Mac's breach of contract claim without mentioning the lawsuits and judgment, facts regarding the lawsuits and judgment need not have been specifically alleged. Accordingly, the court finds that Vintage's alleged failure to disclose the pending lawsuit and the satisfied judgment are encompassed by the claim for breach of contract.

2

### The Satisfied Judgment

As discussed, the S/S guide requires that credit reports for applicants and guarantors "include all available public records information," including "whether any judgments, foreclosures, tax liens, or bankruptcies were discovered in the public records." Appendix, Ex 3, § 202.1. Sellers are "expected" to verify the credit reports. Id. Further, "[w]ritten explanations of the circumstances of [judgments] are required and judgments must have been bonded or satisfied unless nominal in amount." Id.

The court assumes, as the parties appear to have, that Vintage obtained, as required by the S/S guide, credit information for Jarnail Singh "from two national repositories of credit records for each location in which the applicant has resided for the past seven years," including "all legal information not considered

obsolete under the Fair Credit Reporting Act, which includes all credit and legal activity of the last seven years." Id. If so, the court wonders what more Vintage could have done to "verify" this information. There is no evidence that a different or more exhaustive credit report would have uncovered the satisfied judgment. And the mere fact that the satisfied judgment existed is not conclusive evidence that Vintage did not take steps to verify Jarnail Singh's credit information. Unless and until Farmer Mac demonstrates that either (1) commercially reasonable steps to verify the information would have revealed the satisfied judgment or (2) the satisfied judgment was in fact disclosed in the credit report, Vintage cannot be faulted for failing to describe the circumstances of the judgment in writing.

This conclusion is fully consistent with the court's ruling in connection with the tax liability and lien. The undisputed evidence shows that Vintage was aware of the tax lien. In contrast, there is no evidence that Vintage was aware of the satisfied judgment. While the court does not intimate that Vintage cannot be liable for failing to disclose information of which it was unaware, sellers can only be expected to verify that which is verifiable by commercially reasonable means. Farmer Mac has not argued that nondisclosure of the satisfied judgment constituted a breach of any other obligation, representation or warranty; accordingly, the court expresses no opinion in that regard. Farmer Mac's motion for summary adjudication of this issue is DENIED.

//

//

//

*The Pending Lawsuit*

Farmer Mac contends that the pending lawsuit was a contingent liability that needed to be disclosed, notwithstanding that it had not proceeded to judgment before the close of escrow. The only provision of the S/S guide that has been brought to the court's attention which addresses disclosure of contingent liabilities states that "[i]f other than audited financial statements are submitted, the Seller should obtain" a schedule listing "any contingent liabilities including amount, purpose and terms," but such a schedule "may be eliminated" if the financial statements have "sufficient detail." Appendix, Ex 3, § 202.2 (emphasis added). Although there is no indication whether the financial statement of Jarnail Singh was audited, his financial statement did have a ledger entry for contingent liabilities; none was listed. Id, Ex 50. But it would appear that Vintage obtained a financial statement accounting for contingent liabilities as required by § 202.2.

Although Vintage contends that the S/S guide did "not require any type of search * * * which would disclose pending litigation," Doc #167 at 11, Vintage does not appear to dispute that the lawsuit -- which resulted in a six-figure money judgment against Jarnail Singh -- was a contingent liability within the meaning of either the S/S guide or the financial statement for Jarnail Singh. The omission of the pending lawsuit as a contingent liability rendered Jarnail Singh's financial statement inaccurate. Accordingly, based on undisputed evidence, the court finds that the omission of the pending lawsuit from Jarnail Singh's financial

statement constituted a breach of Vintage's representation and warranty that "all loan information submitted to Farmer Mac" was "true and correct." Appendix, Ex 3, § 304.3(1). Farmer Mac's motion for summary adjudication of this issue is GRANTED.

## D

### *Mobile Homes*

Four mobile homes located at the Chelan orchard were given value in the independent appraisal submitted in connection with the RAM loan. Appendix, Ex 9 at 16-17. After RAM defaulted on the loan, Farmer Mac discovered several defects in title for at least two of the mobile homes. The "Silvercrest" unit was subject to a security interest held by Seattle First National Bank. Doc #222, Ex A. Bank of America, successor-in-interest to Seattle First National Bank, repossessed the Silvercrest unit on November 17, 2002. Doc #217, Ex E-1 at 2. The "Concord" unit was legally owned by one Dale Nasman, who apparently was the previous owner of the Chelan orchard. Doc #218. For whatever reason, title to the Concord unit had not been transferred to Jarnail Singh or RAM.

Farmer Mac advances several reasons why these defects create liability under the S/S guide. First, Farmer Mac focuses upon the AARR submitted by Vintage. Robert Hower, on behalf of Vintage, verified that the appraisal (1) "[i]dentifie[d] and consider[d] the effect on the value of the real estate of any personal property, fixtures or intangible items that are not real property but are included in the appraisal," (2) "[c]learly and accurately set forth the appraisal in a manner that is not misleading" and (3) "[s]tate[d] pertinent assumptions and limiting

33

conditions that affect the analyses, opinions and conclusions."
Id, Ex 14.  Robert Hower further indicated that "the value(s)
allocated to the improvements [were] reasonable and adequately
supported."  Id.

The court does not agree that Mr Hower's responses to the
first three items were false or misleading given the assumptions
upon which the appraisal proceeded.  In this respect, the appraisal
clearly stated its assumptions, including the nonexistence of "any
liens or encumbrances."  Id, Ex 9 at 5.  Based on this assumption,
the appraisal considered the value of the mobile homes and other
fixtures to the Chelan property.  Id at 16-17, 24.  Further,
encumbrances and other defects in title to the mobile homes did not
cause the appraisal to be misleading given that the appraisal
clearly states that such considerations were ignored.  With regard
to Mr Hower's representation that the value allocated to the
improvements was reasonable and adequately supported, even assuming
this component of the AARR required Vintage independently to assess
the value added by the mobile homes, the evidence is not conclusive
that Vintage did not make such an assessment.  Farmer Mac cites
Robert Hower's deposition testimony that he did not recall doing
anything to verify the accuracy of the AARR.  Hower Depo at 176:5-
177:25.  This evidence will not sustain Farmer Mac's burden of
persuasion.

Still, the Howers independently represented that "value
is not dependent upon perfection of any lien instrument in addition
to the mortgage(s), as the appraisal value [sic] the units with
permanent fixtures and appurtenances only."  Id, Ex 7 at 14.  This
statement likely reflected a mistaken perception that the mobile

34

homes were true improvements or otherwise so affixed to the property that they were adequately secured by a first deed of trust.  The S/S guide clearly shifts the risk of such a mistake to sellers by requiring sellers to represent and warrant that "[a]ppropriate UCC Financing Statements on fixtures and personal property have been filed and a UCC Search has been conducted indicating a security interest in such fixtures and personal property."  Appendix, Ex 3, § 304.3(5)(c); see also id § 302.5(8) (requiring sellers, when applicable, to submit "a copy of any security documents, including UCC Financing Statements, and a UCC search showing a First Lien position on all fixtures given value in the appraisal").

Vintage points to the agricultural financial statement submitted with the loan application, which disclosed a principal debt associated with an unspecified mobile home.  Id, Ex 6.  The parties apparently agree that this debt related to the Silvercrest unit.  In any event, this disclosure is irrelevant to whether property included in the appraisal was adequately secured.

Based on undisputed evidence, the court concludes that Vintage's failure to ensure that the mobile homes were adequately secured constituted a breach of its obligations under the S/S guide.  Further, Vintage's incorrect representation in the RAM narrative that security interests in the mobile homes were unnecessary was a breach of its representation and warranty that all information submitted to Farmer Mac was "true and correct."  Id, Ex 3, § 304.3(1).  Finally, Vintage breached its representation and warranty that appropriate financing statements had been filed for fixtures and personal property included in the appraisal.

Farmer Mac's motion for summary adjudication of this issue is GRANTED.


**E**

*Water Rights*

Farmer Mac advances three theories of contractual liability in connection with the water rights at the Chelan orchard.  First, Farmer Mac argues that the appraisal was inaccurate in that it incorrectly listed one digit of a certificate number for one of the water permits.  Second, Farmer Mac argues that Vintage was obligated, but failed, to obtain documentation evidencing water rights.  Finally, Farmer Mac appears to argue that the Chelan orchard had rights to less water than described in the appraisal.


**1**

The independent appraisal listed three water permits accounting for rights to a total of 620.77 acre feet/year of water at the Chelan orchard.  Id, Ex 9 at 13.  One permit was listed as bearing certificate number "1-383" and permit number "1156", dated February 18, 1930, and securing rights for 56 acres of land at a rate of 0.74 cubic feet/second.  Id.  In the course of attempting to liquidate the Chelan orchard, Farmer Mac discovered that certificate number 1-383 did not correspond to a water permit for the Chelan orchard.  It thus appeared that the water rights on the Chelan orchard were actually far less than described in the appraisal.  Farmer Mac undertook to learn the actual extent of the water rights on the Chelan orchard, which required the assistance

36

of a water resource engineer "to obtain the accurate certificate pertaining to the missing water rights" and "to confirm the place of use relating to each of the certificates of water rights." Doc #136 at 19. Ultimately, Farmer Mac's research efforts (which Vintage characterizes as "an ill-advised witch hunt," Doc #167 at 17) disclosed that the "missing" water rights were in fact secured by a permit bearing certificate number "1-38_8_" (not "1-38_3_" as indicated in the appraisal). Appendix, Ex 56. Significantly, the water permit was in all other respects identical to the permit listed in the appraisal, including permit number, acreage and volume. Further, the copy of the certificate for this water permit submitted by Farmer Mac appears to bear a certificate number "383" at the top (although the body of the certificate shows "388"). Id.

Based on what appears to be a scrivener's error committed in 1930, Farmer Mac would have the court conclude that the appraisal was inaccurate, constituting a breach of Vintage's representation that all information submitted to Farmer Mac was "true and correct." Id, Ex 3, § 304.3(1). The court cannot imagine a more technical infraction of the S/S guide. In any event, there is no dispute that permit number 1156 did grant water rights to the Chelan orchard. Further, the court finds that the certificate for permit number 1156 did bear the number "383" at the top. Based on this undisputed evidence, the court finds that the appraisal was not inaccurate for purposes of § 304.3(1) of the S/S guide by virtue of the fact that the appraisal listed certificate number 1-383.

Farmer Mac also points to the AARR, where Robert Hower verified that "water rights/entitlements [have] been adequately

37

United States District Court

For the Northern District of California

defined <u>with regard to</u> volume, timeliness, irrigated [acreage,] priority of filing and permanence/reliability of right."  Id, Ex 14 at 2 (emphasis added).  Farmer Mac argues that "the water rights on the property were neither adequately defined nor reliable" due to the allegedly erroneous certificate number.  Doc #136 at 19.  This argument fails for two reasons.  First, Farmer Mac overlooks that the AARR does not require sellers to verify that water rights are adequately "defined" in every conceivable sense, but rather that they are defined "with regard to" particular aspects of the right that have nothing to do with the substantive qualities of the water rights, not, for example, certificate numbers.  Second, the fact that the appraisal's list of water permits may not have been a reliable tool for tracking down the water permit in question has nothing to do with the reliability of the water right.  The purpose of the appraisal's discussion of water rights is to describe "the quality and availability of irrigation water," Appendix, Ex 3, § 204.5, not to provide Farmer Mac with a tool for obtaining copies of water permits.

The court concludes that the appraisal's listing of certificate number 1-383 did not, of itself, constitute a breach of any obligations, representations or warranties under the S/S guide. Farmer Mac's motion for summary adjudication of this issue is DENIED.  Further, in light of the ample factual record and the parties' full briefing of the issue, the court finds it appropriate, *sua sponte*, to GRANT summary adjudication in favor of Vintage on this discrete issue.  See, e g, <u>Gospel Missions of America v City of Los Angeles</u>, 328 F3d 548, 553 (9th Cir 2003) ("Even when there has been no cross-motion for summary judgment, a

district court may enter summary judgment sua sponte against a moving party if the losing party has had a 'full and fair opportunity to ventilate the issues involved in the matter.'" (quoting Cool Fuel, Inc v Connett, 685 F2d 309, 312 (9th Cir 1982)).

2

Farmer Mac claims Vintage breached its obligations by failing to verify that the appraisal was based on an examination of water permits. Farmer Mac does not appear to argue that the appraiser did not himself obtain water permits. Indeed, the specificity with which the appraisal describes the water permits would belie such a contention. Rather, Farmer Mac argues that Vintage, in order to fulfill its obligations in connection with the AARR, was required (but failed) to obtain and examine water permits for the Chelan orchard.

Farmer Mac first points to § 204.5 of the S/S guide, which requires sellers to verify that the appraisal "include[s] a discussion of * * * availability of irrigation water (if a factor) as evidenced by documented water rights and entitlements[.]" The most natural reading of this language is that sellers are required to confirm that the appraisal's assessment of the water rights was based on documentation. The court concludes that § 204.5 of the S/S guide did not, of itself, obligate Vintage to obtain documentation pertaining to water rights.

Farmer Mac finds surer footing in § 304.3(30), which requires sellers to represent and warrant that "such documentation has been obtained, as may be necessary, to insure the delivery of

39

water to the Mortgaged Property."  But even assuming that Vintage was obligated to obtain documentation pertaining to water rights, Farmer Mac has not conclusively demonstrated that Vintage did not obtain such documentation.  Farmer Mac argues that had Vintage obtained the water permits, Vintage would have discovered that the certificate number was incorrect.  A jury could certainly conclude that Vintage, concerned with substance over form, overlooked this technical glitch.  Or a jury could conclude that the certificate did in fact bear the number "383" at the top, thereby explaining Vintage's failure to question the accuracy of the appraisal.

Farmer Mac further relies upon Robert Hower's deposition testimony that he did not recall doing anything to verify the accuracy of the appraisal's discussion of water rights and that he did not recall having a conversation with Anne Dennis regarding water rights.  Hower Depo at 176:11-177:25.  The court does not agree that this is conclusive evidence.  Furthermore, Farmer Mac did not present its argument regarding sellers' obligation to obtain documentation pertaining to water rights until its reply, to which Vintage had no opportunity to respond.  Farmer Mac's motion for summary adjudication of this issue is DENIED.

3

Finally, Farmer Mac claims that the Chelan orchard in fact had the right to less water than described in the appraisal. The only evidence Farmer Mac submitted to support its contention was the declaration of Gary Johnson, who helped Farmer Mac ascertain the true extent of the water rights associated with Chelan orchard.  Mr Johnson asserts that "water rights appurtenant

to the Chelan property were eventually determined to be 370.83"
acre feet/year, not 620.77 acre feet/year as listed in the
appraisal.  Doc #137 at 9.  But Mr Johnson's declaration does not
describe the basis for this calculation.  The true extent of the
water rights associated with the Chelan orchard presents a triable
issue of fact.  Farmer Mac's motion for summary adjudication of
this issue is DENIED.

VI

The second amended counterclaim asserts against Farmer
Mac three distinct claims for breach of contract, a claim for
breach of the implied covenant of good faith and fair dealing and a
claim for conversion.  Against both Farmer Mac and Zions, Vintage
and the Howers allege interference with prospective economic
advantage, trade label and restraint of trade.  Farmer Mac and
Zions jointly move for summary judgment on all counterclaims.

A

1

*Breach of Contract #1:  Anticipatory Breach*

On October 16, 2002, Farmer Mac demanded that Vintage
repurchase the RAM loan no later than November 15, 2002.  Appendix,
Ex 29.  After Vintage declined to repurchase the RAM loan, Farmer
Mac suspended Vintage as a seller and originator of Farmer Mac
loans on December 10, 2002.  Id, Ex 33.  The first counterclaim
alleges that Farmer Mac's decision not to purchase loans from
Vintage pending resolution of the RAM loan situation constituted an
anticipatory breach of the S/S agreement.  Doc #57 at 13.

41

"'Anticipatory breach occurs when one of the parties to a bilateral contract repudiates the contract. The repudiation may be express or implied.'" <u>Martinez v Scott Specialty Gases, Inc</u>, 83 Cal App 4th 1236, 1246 (2000) (quoting <u>Taylor v Johnston</u>, 15 Cal 3d 130, 137 (1975)). Express repudiation requires a "clear, positive, unequivocal refusal to perform." Id. Implied repudiation occurs where the promisor "puts it out of his power to perform so as to make substantial performance of his promise impossible." Id. Vintage and the Howers' allegations do not implicate the doctrine of implied repudiation.

The S/S agreement is clear regarding Farmer Mac's obligations to purchase loans from approved sellers: "The fact that Farmer Mac signed this Agreement does not mean that Farmer Mac must issue a Commitment to Purchase * * * any mortgage submitted to Farmer Mac for review and approval. Any obligation to purchase will arise only after review and approval and the issuance by Farmer Mac of a Commitment to Purchase * * *." Appendix, Ex 2, § 2.3. Accordingly, in order to constitute an express repudiation, the December 10, 2002, letter must have unequivocally conveyed that Farmer Mac would not purchase loans that it had committed to purchase. The court concludes that Farmer Mac did not expressly repudiate its obligations under the S/S agreement.

First, the letter makes clear that the suspension was only to last until the RAM issue was resolved to Farmer Mac's satisfaction. Id, Ex 33. More important, however, the letter provides no indication -- much less a clear and unequivocal expression -- that Farmer Mac would not purchase loans for which a commitment to purchase had been issued. Finally, on December 27,

42

2002, Farmer Mac expressly stated that it would "continue to process any [Vintage] loans that were in the pipeline at the time of suspension." Id, Ex 37. Thus, even assuming the December 10 letter constituted an express repudiation, the December 27 letter would have assured Vintage that Farmer Mac intended to perform its obligations. See <u>Guerrieri v Severini</u>, 51 Cal 2d 12, 19 (1958) (stating that the doctrine of anticipatory breach requires "that there [has] been no retraction of the repudiation by the repudiator prior to the time for performance or prior to a detrimental change in position on the part of the repudiatee in reliance thereon").

In light of Vintage and the Howers' failure to provide any evidence that Farmer Mac expressly repudiated its existing obligations, summary judgment in favor of Farmer Mac is appropriate on the first counterclaim.

2

*Breach of Contract #2: Termination of Vintage as Seller*

The second counterclaim alleges that Farmer Mac breached the S/S agreement "when it unilaterally and without good cause" terminated Vintage as an approved seller on March 24, 2003. Doc #57 at 14.

Pursuant to § 503.2 of the S/S guide, "Farmer Mac may terminate the [S/S agreement] for cause based upon the existence of any one or more of the events of default." Events of default include failure "at any time to comply with any one or more requirement, term, condition" of the S/S agreement and guide, as well as the making of "one or more false or misleading representations or warranties." Appendix, Ex 3, § 503.1(1), (3).

43

For reasons that are not clear, Farmer Mac did not terminate the S/S agreement on March 24, 2003; rather, Farmer Mac simply terminated Vintage as an approved seller.  Although the S/S guide is silent with respect to terminating a seller without terminating the S/S agreement in its entirety, the fact remains that Farmer Mac could have terminated the S/S agreement on March 24, 2003, which would have had the effect of terminating Vintage as an approved seller.  See id § 503.2 ("Any termination of the [S/S agreement] by either party shall terminate the Seller's status as an approved Seller and shall terminate the Seller's ability to submit mortgage loans to Farmer Mac * * *.").  Accordingly, the court construes the S/S guide to provide that an event of default is cause for Farmer Mac to terminate a seller without terminating the S/S agreement. And the court has already found that Vintage breached various obligations, representations and warranties in connection with the RAM loan, see *supra* V, each of which constituted events of default that justified Farmer Mac's termination of the S/S agreement. Farmer Mac has therefore shifted the burden to Vintage and the Howers to demonstrate a triable issue of fact on the element of breach.  In their opposition, Vintage and the Howers merely incorporated by reference the arguments advanced by Vintage in opposition to Farmer Mac's motion for summary adjudication of its breach of contract claim.  To the extent Vintage failed to meet its burden in that regard, so too Vintage and the Howers fail to demonstrate the existence of a triable issue of fact in connection with their second claim for breach of contract.

//

//

44

*Breach of Contract #3: Termination of Vintage as a Field Servicer*

The third counterclaim alleges that Farmer Mac breached the S/S agreement "when it unilaterally and without good cause under the agreement, terminated that agreement and refused to permit [Vintage] to service the loans it had submitted to Farmer Mac." Id at 15. Farmer Mac's termination of Vintage as a field servicer presents a question different from its termination of Vintage as a seller because termination of the S/S agreement does not automatically terminate servicing rights and obligations. The only prerequisite to termination of a field servicer is a "breach of the Seller's servicing obligations as determined by Farmer Mac." Id. Thus, in order to prevail on the third claim for breach of contract, Vintage and the Howers must demonstrate that, as of August 18, 2003, Farmer Mac had not determined that Vintage had breached its field servicing obligations.

The evidence submitted by Farmer Mac demonstrates that Farmer Mac had made such a determination on or before August 18, 2003. On July 17, 2003, Zions requested that Vintage its servicing files to Zions in connection with an Farm Credit Administration audit. Appendix, Ex 58. According to Michael Morris of Farmer Mac, Vintage's tardy and incomplete response to the audit request prompted Farmer Mac to investigate whether Vintage was fulfilling its field servicing obligations. Id, Ex 68 at 441:6-12. This investigation disclosed that Vintage failed to obtain and forward to central servicers annual financial statements for certain loans, as required by § 401.7 of the S/S guide. In this regard, Farmer Mac submitted the uncontradicted deposition testimony of Mark

Rickels of Zions.  Mr Rickels testified that Vintage did not submit any annual financial statements to Zions in 1998 and 2000. Appendix, Ex 74 at 90:23-24; Doc #179, Ex 88.  The evidence further demonstrates that Zions communicated Vintage's non-compliance with § 401.7 to Farmer Mac prior to August 18, 2003.  See id, Ex 61 (August 4, 2003, e-mail from Mark Rickels to Paul Caywood of Farmer Mac and August 12, 2003, e-mail from Paul Caywood to Michael Morris).  Finally, Michael Morris testified that servicing inadequacies such as the failure to obtain annual financial information played a role in Farmer Mac's decision to terminate Vintage as a field servicer.  Id, Ex 68 at 564:17-565:3.

Farmer Mac has satisfied its burden of producing evidence demonstrating Vintage and the Howers' inability to establish the element of breach, and the burden accordingly shifted to Vintage and the Howers to demonstrate the existence of a triable issue of fact on the element of breach.  In their opposition to Farmer Mac and Zions' motion, Vintage and the Howers incorporated by reference arguments advanced in Vintage's opposition to Farmer Mac's motion for summary adjudication of its claim for breach of contract.  Doc #165 at 6.  But that submission does not in any way address Vintage's termination as a field servicer.  See generally Doc #167.

The only cogent argument advanced by Vintage and the Howers is that the decision to terminate Vintage as a field servicer was not based upon any breach of servicing obligations, but rather upon the events of default underlying Farmer Mac's claim against Vintage for breach of contract.  See Doc #165 at 8. Putting aside the fact that Vintage and the Howers have not cited supporting evidence, the court disagrees.  The August 18, 2003,

letter terminating Vintage as a field servicer stated: "One or more events of default listed in [§ 503.1 of the S/S guide] exist, as set forth in further detail in, but not limited to, the allegations of that [sic] complaint recently filed in the U.S. District Court for the Northern District of California * * *." Appendix, Ex 62 (emphasis added). This does not demonstrate that Farmer Mac's decision to terminate Vintage as a field servicer was not motivated by deficiencies in Vintage's field servicing. Nor does this tend to prove that Farmer Mac did not determine that Vintage had breached its field servicing obligations. Vintage and the Howers have failed to carry their burden of demonstrating a triable issue of fact on the element of breach in connection with their third claim for breach of contract.

4

*Breach of Implied Covenant of Good Faith and Fair Dealing*

Vintage and the Howers allege that Farmer Mac's termination of Vintage's rights as a seller and servicer constituted a breach of the implied covenant of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Carma Developers (California), Inc v Marathon Development California, Inc, 2 Cal 4th 342, 371 (1992). "The covenant of good faith and fair dealing finds particular application in situations where," as in this case, "one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith." Id at 372. "It is universally recognized," however, that "the scope of conduct prohibited by the

47

covenant of good faith is circumscribed by the purposes and express terms of the contract."  Id at 373.  Thus, the California Supreme Court has stated that where a right to terminate an agreement is expressly permitted by the contract and within the parties' reasonable expectations, exercise of that right "can never violate an implied covenant of good faith and fair dealing."  Id at 376. As one California court has stated:

> The covenant of good faith and fair dealing has been held in certain special cases to supply a requirement of good cause for termination where the contract itself is silent or ambiguous on that subject.  No obligation can be implied, however, which would result in the obliteration of a right expressly given under a contract.

Gerdlund v Electronic Dispensers Int'l, 190 Cal App 3d 263, 277 (1987) (discussed with approval in Carma Developers, 2 Cal 4th at 375-76).

Applying these principles to the instant case, the claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law.  As discussed in connection with the counterclaims for breach of contract, Farmer Mac was entitled, by virtue of the express terms of the S/S guide, to terminate Vintage as a seller and servicer.  Under these circumstances, the implied covenant of good faith and fair dealing cannot impose liability upon Farmer Mac for exercising rights it enjoyed under the contract.

B

*Conversion*

Vintage and the Howers allege that Farmer Mac has wrongfully retained servicing fees on loans sold by Vintage to

48

Farmer Mac. Doc #57 at 17. Under California law, the elements of conversion are (1) plaintiff's ownership or right to possession of the property at the time of conversion, (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights and (3) damages. <u>Oakdale Village Group v Fong</u>, 43 Cal App 4th 539, 543-44 (1996). "Money can be the subject of an action for conversion if a specific sum capable of identification is involved." <u>Farmers Ins Exchange v Zerin</u>, 53 Cal App 4th 445, 452 (1997).

As an initial matter, it is unclear whether Vintage and the Howers seek fees for services they provided prior to Vintage's termination as a servicer or whether they seek fees for services Vintage would have provided but for its termination. Compare Doc #165 at 6 ("[Vintage] does not claim that Farmer Mac retained servicing fees which [Vintage] would otherwise have earned under the [S/S agreement]."), with id at 9 (calculating the amount of retained fees on the basis of payments made to the servicer engaged by Farmer Mac to service loans previously serviced by Vintage), and id ("Farmer Mac had taken without court judgment $330,000 from [Vintage] every year for the foreseeable future * * *."). As best the court can decipher, Vintage and the Howers posit that Vintage earned the right to all servicing fees for loans sold by Vintage, regardless whether Vintage actually provided the underlying services. Id at 6-7 ("[Vintage] has not alleged a contractual right to receive payment of money in the future, [Vintage] has alleged that Farmer Mac retained and failed to disburse service fees which already belonged to [Vintage].").

//

49

To the extent Vintage and the Howers' alleged right to servicing fees is predicated on their claim that Farmer Mac wrongfully terminated Vintage as a servicer, the claim for conversion must fail because the court has already ruled that Farmer Mac's termination of Vintage as a servicer was proper under the terms of the S/S guide.  To the extent Vintage and the Howers' alleged right to servicing fees is predicated on their contention that Vintage was entitled to servicing fees even after being terminated as a loan servicer, the court agrees with Farmer Mac that the claim for conversion must fail for the reasons set forth by the Ninth Circuit in <u>American Bankers Mortgage Corp v Federal Home Loan Mortgage Corp</u>, 75 F3d 1401 (9th Cir 1996).

<u>American Bankers</u> involved a terminated seller/servicer's claim for conversion against "Freddie Mac" (Farmer Mac's federally chartered counterpart in the secondary market for home mortgages). Plaintiff ABM argued that "it had at the least a right of possession to the servicing rights in the portfolio of mortgages it serviced for Freddie Mac and that Freddie Mac's transfer of those servicing rights constituted conversion."  Id at 1411.  (ABM apparently understood, as Vintage and the Howers apparently do not, that it had no right to servicing fees without a right to provide the underlying services.)  The rights and obligations of Freddie Mac and ABM were governed by a seller/servicer guide similar in all relevant respects to the S/S guide in this case.  Compare id at 1412 ("[U]nless an entity is approved by Freddie Mac as a Seller/Servicer, it has no right to service mortgages purchased by Freddie Mac."), with Appendix, Ex 3, § 501.3 ("The Seller's right to continue selling and servicing Qualified Loans under its [S/S]

50

Agreement depends upon, among other things, its continuing to meet the eligibility requirements in Section 501.1 of the Guide and selling acceptable Qualified Loans to Farmer Mac."). The Ninth Circuit reasoned that "[u]pon termination, ABM ceased to be a 'Seller/Servicer' and by the terms of the contract had no right to service mortgages owned by Freddie Mac." Id. "Therefore, ABM had no remaining possessory interest in the servicing rights to its mortgage portfolio" and could not establish the first element of its conversion claim. Id.

Vintage and the Howers attempt to distinguish American Bankers by arguing that ABM and Vintage were not similarly situated as servicers and that the Freddie Mac guide differed from the S/S guide in this case. Doc #165 at 9-11. For example, Vintage and the Howers cite § 503.2 of the S/S guide for the proposition that "there is no requirement that a servicer be a Seller/Servicer in good standing or even be a Seller/Servicer at all" in order to be entitled to servicing fees on loans sold to Farmer Mac. Doc #165 at 11. The court disagrees. Section 503.2 simply states that termination of the S/S agreement automatically terminates a seller/servicer as a seller but not a servicer; it by no means suggests that servicing rights survive Farmer Mac's decision to terminate a seller/servicer as a servicer. The remainder of Farmer Mac and Zions' argument is neither cogent nor substantiated.

Because Vintage and the Howers cannot establish a right to service loans, they cannot establish a right to servicing fees, and their counterclaim for conversion fails as a matter of law.

//

//

51

## C

The counterclaims for restraint of trade, trade libel and intentional interference with prospective advantage merit only brief discussion. "Under the federal standard [for summary judgment] a moving defendant may shift the burden of producing evidence to the nonmoving plaintiff merely by 'showing' -- that is, pointing out through argument -- the absence of evidence to support plaintiff's claim." Fairbank v Wunderman Cato Johnson, 212 F3d 528, 532 (9th Cir 2000). Farmer Mac and Zions have pointed out the absence of evidence, thereby shifting the burden on these three counterclaims to Vintage and the Howers, who did not even attempt to meet their burden.

### 1

### *Restraint of Trade*

"In the absence of proof of an agreement or conspiracy, there can be no violation" of the Cartwright Act, Cal Bus & Prof Code § 16720 et seq. Roth v Rhodes, 25 Cal App 4th 530, 545 (1994). The California Supreme Court has described with precision the nature and quantum of evidence of a conspiracy that is necessary to survive summary judgment:

> [I]n order to carry a burden of production to make a prima facie showing that there is a triable issue of the material fact of the existence of an unlawful conspiracy, a plaintiff * * * must present evidence that would allow a reasonable trier of fact to find in his favor on the unlawful-conspiracy issue by a preponderance of the evidence, that is, to find an unlawful conspiracy more likely than not. Ambiguous evidence or inferences showing or implying conduct that is as consistent with permissible competition by independent actors as with unlawful conspiracy by colluding ones do not allow such a trier of fact so to find. * * * [I]n addition, the plaintiff must

52

> present evidence that tends to exclude, although it
> need not actually exclude, the possibility that the
> alleged conspirators acted independently rather than
> collusively.  Insufficient is a mere assertion that
> a reasonable trier of fact might disbelieve any
> denial by the defendants of an unlawful conspiracy.

<u>Aguilar v Atlantic Richfield Co</u>, 25 Cal 4th 826, 852 (2001)

(citation and footnote omitted).

Vintage and the Howers vaguely allege that "Farmer Mac instructed and conspired and agreed with other agricultural loan sellers, including counter defendant Zions, not to do business with counterclaimants."  Doc #57 at 20.  The only evidence suggesting the existence of a combination or conspiracy is the deposition of Robert Hower, who testified that Farmer Mac instructed Zions and various agricultural loan sellers not to accept loans originated. Specifically, Mr Hower testified that he had been told by Zions that "they were told [by Farmer Mac] that they were no longer to do business with [the Howers and Vintage].  And that was the last word."  Appendix, Ex 65 at 459:17-22.  Mr Hower further testified that he had been told by Tom Griffin of Ag First that Farmer Mac had instructed Mr Griffin "not to accept anything" from Vintage and to "not continue to do business with [Vintage] under our previous correspondent relationship prior to being approved with Farmer Mac or subsequent to being approved as a direct seller to Farmer Mac."  Id at 461:14-23.

Even assuming that Vintage and the Howers could present <u>admissible</u> evidence to this effect (as opposed to Mr Hower's hearsay testimony), such evidence would not demonstrate the existence of a combination, conspiracy or other unlawful agreement. With regard to Zions, Farmer Mac and Zions presented evidence that,

at least for purposes of agricultural lending, Zions is an agent of Farmer Mac.  See Doc #132 at 18.  Under these circumstances, Zions and Farmer Mac could not have conspired in violation of the Cartwright Act.  See <u>Roth v Rhodes</u>, 25 Cal App 4th 530, 544 (1994); cf <u>Williams v I B Fischer Nevada</u>, 999 F2d 445, 447 (9th Cir 1993) ("To be capable of conspiring [for purposes of § 1 of the Sherman Act], corporate entities must be sufficiently independent of each other." (internal quotations omitted)).

The hearsay statement by Mr Griffin from Ag First -- even if admissible, which the court doubts -- is not evidence of the existence of a combination, conspiracy or other unlawful agreement. Given the structure of the relevant business relationships, Farmer Mac could not have effectuated its decision not to purchase loans originated by Vintage without instructing sellers not to offer any Vintage-originated loans for sale to Farmer Mac.  This is as (if not more) consistent with legal behavior as illegal behavior.  The burden therefore shifted to Vintage and the Howers to present evidence tending to exclude the possibility that the decision not to deal with Vintage was unilaterally made by Farmer Mac.  Far from carrying this burden, Vintage offered no opposition to Farmer Mac and Zions' motion.  Summary judgment in favor of Farmer Mac and Zions on the restraint of trade claim is therefore appropriate.

**2**

*Trade Libel*

Trade libel is the intentional disparagement of the quality of property that results in pecuniary damage.  <u>Computer Xpress, Inc v Jackson</u>, 93 Cal App 4th 993, 1010 (2001) (citing

1    <u>Leonardini v Shell Oil Co</u>, 216 Cal App 3d 547, 572 (1989)).  "To

2    constitute trade libel, a statement must be false."  Id.

3         The only evidence suggesting the possibility of

4    disparaging statements is the deposition testimony of Robert Hower.

5    Mr Hower testified that Farmer Mac had instructed other

6    agricultural loan sellers not to do business with Vintage.

7    Appendix, Ex 65 at 456:4-466:6.  Again, generously overlooking the

8    hearsay nature of Mr Hower's testimony, Farmer Mac and Zions point

9    out that nothing about Mr Hower's testimony evidences statements by

10   Farmer Mac regarding the quality of Vintage's services, much less

11   false statements.  Doc #132 at 20-21.  Farmer Mac and Zions further

12   point to Vintage and the Howers' responses to interrogatories

13   directed at the alleged false and disparaging statements, which

14   were obstinately devoid of any indication that Vintage and the

15   Howers have any evidence that would support a claim for trade

16   libel.  Id at 20.

17        Farmer Mac and Zions therefore shifted the burden to

18   Vintage and the Howers to come forward with admissible evidence of

19   a false statement regarding the quality of Vintage's services.

20   Once again, Vintage and the Howers did not even attempt to meet

21   that burden.

22

23                                   3

24   *Intentional Interference with Prospective Economic Advantage*

25        In order to prevail on their counterclaim for intentional

26   interference with prospective economic advantage, Vintage and the

27   Howers must establish that alleged conduct was independently

28   wrongful -- that is, "wrongful apart from the interference itself."

                                   55

<u>Korea Supply Co v Lockheed Martin Corp</u>, 29 Cal 4th 1134, 1154 (2003).  The independently wrongful conduct alleged by Vintage and the Howers includes (1) the suspension and termination of Vintage as an approved seller and servicer of Farmer Mac loans, (2) "disparaging [Vintage]'s services to third parties," (3) "refusing to do business with [Vintage]" and (4) "assisting Farmer Mac in its attempt to pressure [Vintage] to buy back the RAM loan."  Doc #57 at 18.

The court has already determined that the first and third allegations "are not allegations of independently wrongful conduct."  Doc #55 at 10.  The second allegation is predicated on the counterclaim for trade libel, which the court has already rejected.  Farmer Mac and Zions contend that the fourth allegation is predicated on the counterclaim for restraint of trade, but, after reviewing the pleadings, the court sees no connection between the fourth allegation and the alleged restraint of trade.  In any event, even assuming that an agent assisting its principal in enforcing its contractual rights is independently wrongful conduct, Farmer Mac and Zions have pointed out the absence of any evidence supporting that allegation.  Doc #132 at 18-19.

In light of (1) the court's order granting summary judgment in favor of Farmer Mac and Zions on the claim for trade libel, (2) Farmer Mac and Zions' shifting the burden to Vintage and the Howers by pointing out the absence of any evidence of independently wrongful conduct and (3) Vintage and the Howers' failure even to attempt to meet their burden, summary judgment in favor of Farmer Mac and Zions is appropriate on the counterclaim for interference with prospective economic advantage.

56

D

In sum, Farmer Mac and Zions' motion for summary judgment is GRANTED.


VII

The third-party complaint asserts a claim for express indemnity against New Century and Stewart.  The third-party complaint further asserts claims for "implied indemnity," "equitable indemnity," contribution and declaratory relief against New Century, Stewart and Zions.  Vintage concedes that the legal principles governing its claims for implied indemnity and equitable indemnity are identical.  Doc #163 at 11, 15.  Accordingly, the court treats these two claims as one for present purposes.  New Century, Stewart and Zions each move for summary judgment against Vintage on all third-party claims.


A

1

*Express Indemnity Against New Century*

The third-party complaint vaguely asserts that Vintage's claim for express indemnity is based on "written and/or oral contracts" between Vintage and New Century.  Doc #15 at 10.  The only indemnity agreement between Vintage and New Century was contained in the escrow instructions, whereby New Century agreed "to be responsible for actual losses, costs and expenses incurred by [Vintage] in connection with [the RAM loan] transaction when such losses arise due to [New Century's] failure to comply with <u>these</u> [escrow] instructions" (the "indemnity provision").  Doc

#121 (Bardellini Decl), Ex D at 6 (emphasis added).  Accordingly, New Century is entitled to summary judgment on the claim for express indemnity if there is no genuine dispute of material fact regarding New Century's compliance with the escrow instructions or if the claims alleged against Vintage and the Howers do not arise from New Century's failure to comply with the instructions.  See, e g, <u>Four Star Electric</u>, 7 Cal App 4th at 1380 (stating that an express indemnity plaintiff must establish a loss within the meaning of the indemnity agreement).  There is no evidence, nor do Vintage and the Howers contend, that New Century breached the <u>written</u> escrow instructions.  To the contrary, Anne Dennis testified that New Century complied with the written escrow instructions.  See Bardellini Decl, Ex A (Dennis Depo) at 297:8-13, 355:17-22.  Rather, the claim for express indemnity against New Century hinges on Vintage and the Howers' assertion that "New Century agreed to perform tasks and took on responsibilities that went beyond the written escrow agreement."  Doc #157 at 12.

        "In interpreting an express indemnity agreement, the courts look first to the words of the contract to determine the intended scope of the indemnity agreement."  <u>Smoketree-Lake Murray, Ltd v Mills Concrete Construction Co, Inc</u>,  234 Cal App 3d 1724, 1737 (1991).  In this case, the indemnity provision, by its own clear terms, encompasses only losses arising from failure to comply with "these" (i e, the written) -- and, by negative implication, no other -- instructions.  Accordingly, in order for the indemnity provision to encompass losses arising from deficient performance of the additional undertakings adduced by Vintage and the Howers, the court would have to modify the written escrow instructions.

Vintage and the Howers casually state that "[i]t is well established that additional escrow instructions can be given orally as long as the additional instructions do not alter the written instructions," citing <u>Thoroman v David</u>, 199 Cal 386 (1926). Doc #157 at 8. That is beside the point. In order for the indemnity provision to encompass any additional instructions, the written instructions would need to be modified. And as the California Supreme Court observed in <u>Thoroman</u>, escrow instructions are subject to the rule excluding parol evidence to modify <u>or</u> add another term to the agreement when the agreement appears on its face to be a complete expression of the parties' obligations. 199 Cal at 390 (internal quotations omitted); see also <u>Ebenson v Userware Int'l, Inc</u>, 11 Cal App 4th 631, 637 (1992) (stating that "parol evidence is inadmissible even to add terms not inconsistent with the writing" when a contract is completely integrated). Vintage and the Howers have offered no reason why the court should modify the written terms of the escrow instructions to conform to parol evidence. The fact that New Century may have performed additional tasks at Vintage's request in the weeks leading up to the close of escrow is not evidence that the parties intended the indemnity provision to encompass losses arising from deficient performance of those tasks.

Even if the court found it proper to modify the instructions such that the indemnity provision would encompass losses arising from New Century's deficient performance of additional undertakings, most of the additional undertakings described (but for the most part unsubstantiated) by Vintage and the Howers do not relate to any of the claims asserted by Farmer

Mac.  See Doc #157 at 7-9.  For example, Vintage and the Howers claim that "New Century assumed the responsibility for creating and modifying the note, which ultimately reflected Jarnail Singh as a borrower when he was not a legal borrower and had only been approved as a guarantor of the loan."  Id at 7.  Even assuming these facts are true (and once again ignoring Vintage and the Howers' failure to cite any supporting evidence), Farmer Mac's claims do not implicate the alleged deficiency in New Century's performance.  Farmer Mac's claim regarding Jarnail Singh stems from the omission of the tax lien and liability from Mr Singh's financial statement and Vintage's failure to explain this omission in writing.  As discussed, whether Mr Singh was a guarantor or borrower for purposes of the loan application package and the S/S guide -- much less whether he was listed as a borrower on the note -- is simply inapposite.  See *supra* V(A).

The only undertaking adduced by Vintage and the Howers that bears any cognizable relationship to Farmer Mac's claims is that New Century "assumed responsibility for providing copies of the preliminary title reports and date down endorsements to Zions Bank."  Doc #157 at 3.  The only evidence offered by Vintage and the Howers in this regard is a memorandum, dated June 24, 1999, from Anne Dennis of Vintage to Don Lewin of New Century.  Ms Dennis requested that Mr Lewin forward a preliminary title report to Zions.  Doc #159 (Dennis Decl), Ex B.  But Vintage and the Howers have not pointed to any evidence that Vintage instructed New Century to forward to Zions the date down endorsement reflecting the tax lien, which did not come into existence until well into August of 1999.  To the contrary, when asked whether date down

endorsements were "documents that [New Century] would typically send to Zions in connection with the Farmer Mac loan," Don Lewin responded, "I would say no. [Vintage] was the lender in the escrow, and so the information would to [Vintage], and they would forward it to Zions." Doc #172 (Carey Decl), Ex A at 87:16-25.

Although New Century does not dispute that it was involved in addressing the tax lien after it appeared in the date down endorsement, New Century has presented evidence that New Century did everything requested by Vintage in connection with the tax lien. Bardellini Decl, Ex F (Hower Depo) at 596:18-597:21. Vintage and the Howers responded by simply asserting that "Farmer Mac complains that the existence of a Canadian tax lien against Jarnail Singh was never disclosed." Doc #157 at 9. But Vintage and the Howers have offered no evidence that New Century's responsibilities, if any, in connection with the tax lien extended beyond helping Vintage resolve the matter to Zions' satisfaction. Nor have Vintage and the Howers offered evidence demonstrating that New Century's performance of this undertaking was inadequate.

The court concludes (1) by its terms, the indemnity provision does not encompass deficient performance of additional undertakings by New Century on behalf of Vintage and (2) even if the court were to modify the loan closing instructions and indemnity provision to conform to extrinsic evidence, there is no evidence that New Century failed to perform as requested by Vintage.

//

//

//

*Express Indemnity Against Stewart*

In addition to Stewart's obligations under the title insurance policy, Stewart agreed in a letter dated September 29, 1999, to indemnify Vintage for certain losses caused by New Century in its capacity as escrow agent (the "insured closing letter"). In response to interrogatories, Vintage and the Howers identified the insured closing letter as the source of Stewart's duty to indemnify Vintage in this action. Epstein Decl, Ex J at 2; Ex K at 2. And in their opposition to Stewart's motion, Vintage and the Howers premised liability for express indemnity solely upon the insured closing letter. See generally Doc #160.

In the insured closing letter, Stewart agreed to reimburse Vintage for losses arising from New Century's failure to comply with "written closing and/or escrow instructions" to the extent such losses relate to "(a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land," "(b) the obtaining of any other document specifically required by" Vintage or "(c) the collection and payment of funds due" to Vintage. Epstein Decl, Ex L. Further, Stewart agreed to reimburse Vintage for losses arising from any fraud or dishonesty on the part of New Century in handling funds or documents in connection with closing and/or escrow. Id. The insured closing letter excluded liability for claims not filed within ninety days of discovery of loss and claims not filed within one year of closing. Id.

Stewart argues that there can be no liability under the insured closing letter because "there is no allegation by Farmer

Mac that [New Century] failed to follow [Vintage]'s written closing instructions, or that any of the damages Farmer Mac is claiming were caused by the failure of the escrow agent to follow the instructions." Doc #123 at 14. The court finds this to be a cramped view of what claims may give rise to indemnity under the insured closing letter. Farmer Mac need not have specifically framed its claims in terms of a failure to follow closing instructions in order to implicate indemnity under the insured closing letter; Farmer Mac must have alleged a claim that is encompassed within the meaning of the insured closing letter's indemnity language.

Stewart contends that none of Farmer Mac's claims relate to the three discrete categories of losses for which the insured closing letter provided coverage. For example, none of Farmer Mac's claims relate to the status of title in the real property securing the RAM loan. Stewart further argues that the insured closing letter, by its own terms, expired one year from the date of closing, long before the third-party complaint was filed. The court agrees with Stewart on both points. Stewart has shifted the burden to Vintage and the Howers to produce evidence tending to establish a loss within the meaning of the indemnity agreement.

In response, Vintage and the Howers posit that the insured closing letter encompasses losses caused by New Century's failure to perform obligations it undertook in addition to those set forth in the written escrow instructions. This theory fails simply by virtue of the language of the insured closing letter. First, the insured closing letter clearly states that liability is limited to failure to comply with the <u>written</u> escrow instructions.

Epstein Decl, Ex L.  Further, none of the additional undertakings that are supported by the evidence implicates the three discrete categories of failure to follow instructions against which the insured closing letter provides indemnification.  And as discussed, there is no evidence that New Century failed to follow any instruction (written or unwritten) that bears a causal relationship to Farmer Mac's claimed injuries.  Finally, Vintage and the Howers' attempt to overcome the one-year limitation on indemnity under the insured closing letter is unconvincing and unsupported by legal authority.

Stewart's motion for summary judgment on the claim for express indemnity is GRANTED.

B

*Equitable Indemnity Against New Century, Stewart and Zions*

Under the doctrine of equitable indemnity, "a concurrent tortfeasor enjoys a common law right to obtain partial indemnification from other concurrent tortfeasors on a comparative fault basis * * *."  American Motorcycle Ass'n v Superior Court, 146 Cal Rptr 182, 199 (1978).  "Quite simply, equitable indemnification is a matter of fairness."  Jaffe v Huxley Architecture, 200 Cal App 3d 1188, 1191 (1988).  The party from whom equitable indemnity is sought need not have owed a duty to the party seeking indemnity.  "What is important," however, "is the relationship of the tortfeasors to the plaintiff and the interrelated nature of the harm done."  Id at 1192.  Accordingly, California courts have required the party seeking equitable indemnity to demonstrate that the proposed indemnitor would be

64

liable as a tortfeasor to the underlying plaintiff.  See <u>GEM</u>
<u>Developers v Hallcraft Homes of San Diego, Inc</u>, 213 Cal App 3d 419,
429 (1989).  Generally, the basis for tort liability against the
proposed indemnitor is a duty owed to the underlying plaintiff.
<u>BFGC Architects Planners, Inc v Forcum/Mackey Construction, Inc</u>,
119 Cal App 4th 848, 852 (2004).

With these legal principles in mind, the court turns to
the claims for equitable indemnity asserted against New Century,
Stewart and Zions.

1

Where "the parties have expressly contracted with respect
to the duty to indemnify, the extent of the duty must be determined
from the contract and not by reliance on the independent doctrine
of equitable indemnity."  <u>Rossmoor Sanitation, Inc v Plylon, Inc</u>,
13 Cal 3d 622, 628 (1975) (Mosk, J); see also <u>Maryland Casualty Co</u>
<u>v Bailey & Sons, Inc</u>, 35 Cal App 4th 856, 872-74 (1995) (granting
summary judgment on claim for equitable indemnity based on
existence express indemnity agreement); <u>Regional Steel Corp v</u>
<u>Superior Court</u>, 25 Cal App 4th 525, 528-29 (1994).  The title
insurance policy and the indemnity clause of the insured closing
letter preclude any claim of equitable indemnity by Vintage against
Stewart.  Stewart's motion for summary judgment on the claim for
equitable indemnity is accordingly GRANTED.

2

Although the indemnity provision in the loan closing
instructions would seem to indicate a similar disposition of the

65

claim for equitable indemnity against New Century, the court
hesitates to allow the indemnity provision to preclude equitable
indemnity against New Century *ab initio* in light of the additional
undertakings allegedly performed by New Century separate and apart
from the written loan closing instructions.  Nevertheless, the
claim for equitable indemnity against New Century fails as a matter
of law.

As discussed, in order to recover on a theory of
equitable indemnity, the proposed indemnitor must be liable as a
tortfeasor to the underlying plaintiff.  The California Supreme
Court carefully explained the nature and extent of escrow holders'
obligations in <u>Summit Financial Holdings, Ltd v Continental Lawyers
Title Co</u>, 117 Cal Rptr 2d 541 (2002).  <u>Summit Financial</u> involved
claims against an escrow holder brought by the assignee of the note
and deed of trust underlying the escrow transaction.  As an
assignee, plaintiff was not a party to the escrow transaction.  The
court first explained that "[a]bsent clear evidence of fraud, an
escrow holder's obligations are limited to compliance with the
parties' instructions."  Id at 545.  "If an escrow holder fails to
carry out an instruction it has contracted to perform, the injured
party has a cause of action for <u>breach of contract</u>."  Id (emphasis
added).  The court then proceeded to refute plaintiff's argument
that even though plaintiff was not a party to the escrow
transaction, defendant owed plaintiff fiduciary and tort duties.
<u>Summit Financial</u> leads to the conclusion that New Century owed no
non-contractual duties to Farmer Mac, which was not a party to the
escrow.

//

66

Vintage and the Howers suggest that Farmer Mac, acting through Zions, was for all practical purposes a party to the escrow due to Zions' involvement in ensuring that the loan documentation conformed to Farmer Mac's requirements. See Doc #157 at 1 ("The [escrow] transaction involved a simultaneous assignment of the note and deed of trust from [Vintage] to Farmer Mac and the funds utilized to close the escrow from Farmer Mac and the borrower exclusively."). But even if Vintage and the Howers could somehow establish that Farmer Mac was a party to the escrow rather than an assignee of the RAM loan, New Century, as an escrow holder, could only be liable to Farmer Mac in <u>contract</u> under <u>Summit Financial</u>.

Vintage and the Howers points to a facsimile communication from Rod Avey of Zions to Anne Dennis of Vintage which contains a list of "additional requirements and documentation needed" in connection with the RAM loan. Dennis Decl, Ex B. According to Ms Dennis, this document was forwarded to Don Lewin of New Century so that New Century could attend to certain of the unfulfilled requirements. Doc #161 (Carey Decl), Ex B at 201:23-203:15, 205:9-206:18. This evidence fails to demonstrate that New Century owed any duties to <u>Farmer Mac</u>. Rather, this evidence simply confirms that Vintage was the party to the escrow and New Century received instructions from Vintage. Vintage and the Howers cite no authority for the proposition that New Century owed a duty to Farmer Mac as assignee by virtue of the fact that Farmer Mac's agent was communicating certain requirements to Vintage that were in turn communicated in the form of instructions to New Century.

New Century's motion for summary judgment on the claim for equitable indemnity is GRANTED.

67

The claim for equitable indemnity against Zions is premised upon Zions' alleged failure to disclose the Jarnail Singh tax lien to Farmer Mac. Under the legal framework governing claims for equitable indemnity discussed above, Zions must have owed a non-contractual duty to Farmer Mac to disclose the existence of the tax lien and Zions must have breached that duty.

Zions does not deny that it was Farmer Mac's agent in connection with the RAM loan. See, e g, Doc #134 at 10 ("[Zions] as a central servicer was Farmer Mac's agent."). Indeed, Zions' argument in connection with the counterclaim for restraint of trade was based on the existence of an agency relationship between Zions and Farmer Mac. See *supra* VI(C)(1). "The law imposes upon an agent the duty to exercise ordinary care to communicate to his principal knowledge acquired in the course of his agency with respect to material facts which might affect the principal's decision concerning a pending transaction entrusted to the agent." Cecka v Beckman & Co, Inc, 28 Cal App 3d 5, 11 (1972). "An agent who violates his duty to use reasonable care, skill and diligence is liable for any losses which his principal may sustain as the result of his negligence or breach of duty." Timmsen v Forest E Olsen, Inc, 6 Cal App 3d 860, 871 (1970). As Farmer Mac's agent, Zions could be held liable in tort to Farmer Mac for failing to communicate the tax lien -- the materiality of which is evidenced by this litigation -- to Farmer Mac.

Zions points to a lack of "evidence of any contractual, agency or fiduciary relationship between [Vintage] or its principals and [Zions]." As discussed, the relationship between

the proposed indemnitor and the proposed indemnitee is irrelevant for purposes of equitable indemnity. See, e g, <u>Jaffe v Huxley Architecture</u>, 200 Cal App 3d 1188, 1192 (1988) ("It would be unfair to require one tortfeasor to bear a loss disproportionate to his relative culpability simply because a tortfeasor who contributed to the loss owed a duty to the plaintiff but not to the defendant."). What matters is whether Zions owed any non-contractual duties to Farmer Mac. Although duty is generally a question of law, in light of the surprisingly scant record and argument regarding the nature of Zions' relationship with Farmer Mac, the court declines at this time to find as a matter of law that Zions owed an agent's duty of disclosure to Farmer Mac. But the court has no trouble concluding that Zions has failed to demonstrate the absence of such a duty.

Zions contends that merely establishing an agency relationship is not enough. According to Zions, Vintage must establish "that each theory of liability (breach of contract, misrepresentation and fraud) asserted by Farmer Mac [against Vintage] was available against Zions and that the claim would have been successful." Doc #177 at 6. Zions relies upon the following language relies upon the following passage from <u>GEM Developers v Hallcraft Homes of San Diego</u>, 213 Cal App 3d 419 (1989):

> We conclude any theory which would have been available to [plaintiff] in a direct action against [cross-defendant] in a direct action against [cross-defendant] and upon which basis loss could have been apportioned in [plaintiff's] action is available to [defendant/cross-complainant] here seeking equitable indemnification. Accordingly, * * * [defendant/cross-complainant] bore the burden of establishing strict liability constituted a theory available to [plaintiff] against [cross-defendant] * * *.

Id at 429.

69

"In other words," according to Zions, "if Farmer Mac's theories of liability * * * against [Vintage] could have been brought by Farmer Mac against [Zions] in a direct action upon which loss could have been apportioned, they would be available to [Vintage]." Doc #177 at 4.

Zions' reading of GEM is plainly incorrect. Vintage and the Howers are not limited to theories alleged by Farmer Mac against Vintage and the Howers; rather, Vintage and the Howers are limited to theories that could have been alleged by Farmer Mac against Zions. Further, Zions' strained interpretation of the doctrine of equitable indemnity is inconsistent with the liberal approach California courts have taken with respect to the concept of joint and several liability in the context of equitable indemnity. Specifically, although joint and several liability is a prerequisite for equitable indemnity, "joint and several liability in the context of equitable indemnity is fairly expansive" and "can apply to acts that are concurrent or successive, joint or several, as long as they create a detriment caused by several actors." BFGC Architects, 119 Cal App 4th at 852; see also GEM, 213 Cal App 3d at 431 (recognizing that the term "joint tortfeasor," when used in the equitable indemnity context, "is a broad term which includes, joint, concurrent and successive tortfeasors"); cf Safeway Stores, Inc v Nest-Kart, 21 Cal 3d 322, 327-32 (1978) (holding that equitable indemnity was available to apportion liability between a strictly liable defendant and a negligent defendant); Yamaha Motor Corp v Paseman, 219 Cal App 3d 958, 962-63, (1990) (reversing dismissal of claim for equitable indemnity on general negligence theory where underlying complaint alleged, inter alia, claims for

70

strict products liability and breach of warranty).

Vintage and the Howers must demonstrate that Zions knew of the tax lien, for if Zions did not know about the tax lien, it could not be liable to Farmer Mac under any tort theory. Zions contends there is no admissible evidence that Zions was aware of the tax lien. Vintage and the Howers appears to concede that there is no documentary evidence that the existence of the tax lien was communicated to Zions. On this point, Vintage and the Howers rely exclusively upon the deposition of New Century employee Debbie Binder, who worked as the escrow agent on the RAM loan. When asked whether she specifically recalled faxing information about the tax lien to Rod Avey of Zions, Ms Binder stated:

> A: I don't remember specifically [faxing either the IRS letter or the date down endorsement to Zions], or what I had on that day, or whatever. I remember that [the tax lien] was a problem, and it was a problem that came up, and that everything that came in to me it was required by Farmer Mac that it be given to [Zions]. [Zions] had to have copies of everything, and they had to review it. * * * So just basing it on how it works through Farmer Mac through Zions, I would have had to have faxed all of these things [the IRS letter and date down endorsement] to [Rod Avey of Zions].

Doc #164 (Carey Decl), Ex A at 28:16-29:4. When asked whether she remembered speaking on the telephone with Mr Avey about the tax lien, Ms Binder stated:

> A: I can't remember my actual conversation with him, but as my procedure as escrow officer, it would have been to fax it to him and wait for his instruction as to how to deal with that.
>
> Q: Okay. But let me just see if I understand. You don't specifically recall having a telephone conversation with Rod Avey about the tax lien prior to the close of escrow?
>
> A: No, it's been too many years. I don't

71

> specifically remember.
>
> Q:    And just to be clear, I'm not asking about,
> like, the specifics of what every person said
> exactly, but just generally, that, you know,
> any discussion about the tax lien generally.
> And my question really is, [y]ou don't have any
> specific recollection of having any
> conversation with Rod Avey about the tax lien
> prior to the close of escrow, correct?
>
> A:    Rod Avey was my only * * * contact there at
> Zions, and I do know that this tax lien was
> causing a delay. And I remember having
> conversation [sic] with them with regards that
> we would have to provide them with a new date
> down or [the tax lien] would have to be
> removed.

Id at 48:4-25 (emphasis added).

Although much of Ms Binder's testimony simply evidences that the tax lien would have been communicated in the ordinary course, and notwithstanding that Ms Binder could not recall the specifics of an actual conversation with Mr Avey, she did testify that she remembered having a conversation with "them" (presumably Mr Avey) regarding the tax lien.

The court disagrees with Zions' characterization of Ms Binder's testimony as speculative or lacking in personal knowledge. And because a jury could reasonably infer from Ms Binder's testimony that the tax lien was disclosed to Zions, Zions' motion for summary judgment on the third-party claims for indemnity is DENIED.

The court does agree with Zions, however, that Vintage cannot shift its contractual liability to Zions through a claim for equitable indemnity. If the court ultimately concludes that Zions owed an agent's duty of disclosure to Farmer Mac and the finder of fact concludes that Zions breached that duty, only Vintage and the

Howers' liability, if any, for fraud and negligent misrepresentation can be subject to apportionment.

C

Briefly stated, the third-party claims for contribution against New Century, Stewart and Zions are unripe at this time because "[a] right of contribution can come into existence <u>only after</u> rendition of a judgment declaring that more than one defendant jointly liable to the plaintiff." <u>Coca-Cola Bottling Co v Lucky Stores, Inc</u>, 11 Cal App 4th 1372, 1378 (1992) (emphasis added). Summary judgment is accordingly GRANTED in favor of New Century, Stewart and Zions on the third-party claims for contribution.

D

Vintage and the Howers' fifth claim seeks a declaration regarding their rights to indemnity and contribution from third-party defendants. Because the court has found that Stewart and New Century are entitled to summary judgment on the claims for express indemnity, equitable indemnity and contribution, summary judgment is GRANTED in favor of Stewart and New Century on the claim for declaratory relief. Further, because the court's order disposes of all claims against Stewart, Stewart's motion to bifurcate the third-party claims for trial purposes, Doc #239, is DENIED AS MOOT.
//
//
//
//

73

## VIII

In sum, the motions to dismiss the amended complaint are DENIED.  Summary judgment in favor of Vintage and the Howers on Farmer Mac's Lanham Act claims is GRANTED IN PART and DENIED IN PART.  Farmer Mac's motion for summary adjudication on its claim for breach of contract is GRANTED IN PART and DENIED IN PART. Farmer Mac and Zions' motion for summary judgment on all counterclaims is GRANTED.  Stewart and New Century's respective motions for summary judgment on all third-party claims are GRANTED; consequently, Stewart's motion to bifurcate the third-party claims is DENIED AS MOOT.  Zions' motion for summary judgment on all third-party claims is GRANTED IN PART and DENIED IN PART.

SO ORDERED.

VAUGHN R WALKER

**United States District Chief Judge**